Case number 320305, consolidated with 3-20-0304, JL Properties Group B, LLC, Mark Dauenberg and Stephen Cole, not individually, but as trustees of the ALI Appellants versus J. Robert J.B. Pritzker, the Governor of Illinois, not individually, but in his exclusive capacity appellee. Thank you. Good morning. Morning. Ms. Hunger, anytime you're ready, you can start. Sorry, Judge, it's James Noonan. I'm sorry, Mr. Noonan. Okay. I'm used to the person being on the left. No worries. Thank you, Justices. May it please the court. My name is James Noonan, and I'm representing here, for purposes of the appeal, the plaintiffs in this action. And I want to thank your honors for taking the time to expedite this hearing and counsel as well. What I'm going to start with is start off to say that this case and the disputes raised here have nothing to do with a challenge to the nature, scope and seriousness of the COVID-19 pandemic. This case is exclusively about the power of the governor to address that disaster, specifically within the context of the statewide ban that he imposed in March of this year on residential evictions and enforcement of existing eviction orders. Critical issue in this case. Let me just ask one question for clarification. It was not my understanding that you were challenging the ability of the governor to issue successive orders. Am I right or wrong about that? So it's the record is a little complicated, Judge. So plaintiffs did not raise that issue below, but the trial court, because it was an issue the trial court felt needed to be addressed. He asked the parties with and we both both plaintiff and defendant agreed that we would hear or we would argue that issue in the in the case below, but it was not raised in our in our complaint. But the issue is, we believe properly before the appellate court today, but it was never raised by you. That's correct. So you responded to the directive of the court. So it is before us. That's correct, Judge. Thank you. Yeah. And I will be addressing that that issue in my remarks. So the issue that there's really effectively two sort of two broader issue broad issues here is one is, did the governor have the power under the Illinois Emergency Management Act to impose the eviction moratorium and then the enforcement of the enforcement moratorium as well. And if he did have that power, how long did it last? It is plaintiff's contention here that the court did not have the power to suspend civil laws, did not have the power to prevent landlords from entry from going to the court using the court system to invoke their rights under the Eviction Act. And, and, and if he did have those powers, those powers lapsed after 30 days. So I would begin my remarks because if the court finds, if the court agrees with plaintiffs that he did not have the power to issue the moratorium in the first place, none of these other issues really need to be addressed. So very briefly, because I know everybody's anxious to get to the issue of the limitation, I think, on the court's, on the governor's powers. But briefly, it is plaintiff's position that the eviction moratoria are not supported or justified by any provisions of the Emergency Management Agency Act. The governor invoked four separate provisions to justify the moratorium, neither of which I think are convincing. The first is that Section 2, that he said that the moratorium is justified under the state resources power under, under Section 2. But a close reading of that refers to state resources. Here we have the court basically preventing private individuals from accessing the court system, invoking their rights under the law. And more importantly, we're dealing with private property, not government property. So the state resources exception plaintiff contends does not apply. Nor does Section 10, which deals with the governor's right to cobble together a temporary housing. This is not a temporary housing situation. These are permanent units and temporary housing, I think everyone would understand, applies, something that's impertinent and transportable. The third provision that the court invoked was Section 12, which is, it's a catch-all provision in a subsection of Section 7 that deals with the transmission and exchange of goods and commodities. The governor takes the position that that catch-all, there's a catch-all language in there that he could do anything he wants in that context, applies to anything. The governor's position, he can do, that language gives him the power to rule the state by executive decree, regardless of, of, of what, of the fact that, that, that these are not goods and commodities that are issued here. So as our position that that catch-all provision, the governor invokes, it's only... So you would maintain that housing stock is not a commodity? That's correct, Judge. Okay. Yeah. My other question, my other question is that you're understanding that the trial court's ruling that state resources or the governor's, this may be more appropriate for closing counsel, that state resources encompasses the court system? So it's that, our position that the state resources provision of Section 2 deals with the governor's right to use rate, utilize, and that term is to utilize state resources to address a disaster or a pandemic. Here we have the court, we have the governor denying the use. Even if we agree that state resources would include the court system, we have the court denying basically the use of it. He's not utilizing it. He's basically preventing anybody access to it or any, I say, our plaintiff class. Okay. Also, I have a question for you. Again, maybe just housekeeping. Since this absorbed in front of Judge Anderson in July, I think, or at least his order was entered in July, the governor has modified the order regarding evictions and it's more in keeping now with the if you could address the fact that when Judge Anderson issued his order, the Supreme Court of our state also had an order in effect after March 20th staying evictions consistent with the CDC requirements. So yeah, so I, it is my position to address the first question, Justice. The seat, the governor's current order tracks the seat. You're right. Tracks the CDC order. And it, to the extent that it, you know, does it raise an issue of whether this appeal is moot? I think it's really what we're talking about here. Yeah. But for one, it's certainly not moot for the, for the enforcement moratorium because both the CDC order and the governor's state, recent state order do not do not affect or do not allow enforcement actions to proceed, but just, they, they do allow in limited circumstances, the filing and commencement of eviction proceedings. But to that extent, the eviction more, the, sorry, the enforcement moratorium is not affected by the CDC order or the governor's order. What about the Supreme Court order? Because the governor's order seems to mirror what the Supreme Court did on March 20th. And that order was effective until August 24th. So there couldn't have been access to the courts because the Supreme Court prevented it. That's right, Judge. You know, and again, this, that may, I think goes really a proper thing into the separation of powers argument we have that. All right. All right. That's okay. I understand your argument, which, which order of the governor are we to focus on when we write our decision? So I think the, the governor, so the order that was entered in, in March and then ultimately continued, which is the, the eviction, which is a 2020 dash 30. And the reason I think we focus on that judge is, and the reason this isn't moot, maybe I'll just jump to that point. The reason that this appeal isn't moved with respect to the new order 72 is that the governor has been very clear that he will do what he feels is necessary to address the pandemic and to continue things like stay at home orders and these eviction moratorium. And we know that the CDC order expires on December 31st. So the fact that the governor, that there's a real threat that this is can be repeated harm that this does not make it moot. In fact, we, we, it's our position that all of the three exceptions to the, to the mootness doctrine would apply, including the public interest exception, as well as the collateral consequences exception. Thank you for answering my question. I've hijacked your argument long enough. No worries. No worries. No worries. So if I can, in the, in the, in the interest of time, I want to address the, the 30 day limitation argument. So it is, it is plaintiff's position that even if the governor had the authority to issue the moratorium back in March of this year, constrain the act to allow the governor to extend it beyond the 30 days by proclaiming the same disaster over and over again. It is our position that actually disregards the language of the statute that isn't there. And, and, and I think more critically, it renders that limitation meaningless. The surely if the legislature was going to let the governor rule the state by executive decree, it intended that power to be limited. And that is our position. Why that 30 day limitation is in there. I note that the attorney general's office prior to this prior to the COVID-19 pandemic took that position that it was a 30 day hard stop. And when that 30 day in order to address emergencies and disaster, the normal workings of government had to be come into play. The legislature had to deal with these problems and issues. However, it's all fit. If the legislature felt that it can give the governor more executive power to do so fine, but that would have led, that was a legislative function. The court, I think it's a fair reading of the statute that the legislature did not intend to give the governor a carte blanche to rule. As long as he's as long as he saw fit through executive decree. Now, Mr. Noonan, I do have a question for you on that. You're saying that originally in your complaint, you did not bring up the successive 30 day issue, correct? That's correct. Okay. Because you were working within the original 30 day as to whether it was substantively permissible or not under law, right? Well, well, by the time we have filed the complaint, the 30 days had but we just, for various reasons, we weren't approaching the case that way. Okay. But in the meantime, and you were directed by the trial court to address that issue, right? That's correct. And where did the trial judge make a definitive ruling on that issue? So the trial court's ruling is found in the record on 471 second or 74, I believe. Yeah, he did. He was a lengthy, a lengthy analysis of that limitation issue. Give me one second, judge. Yeah, well, it's all very lengthy. It is, it is. I agree. All very lengthy. I don't have the site handy, but I'll pick it up during my break here. Okay, well, editing the trial court's loquaciousness in this matter, what did he actually find? So he, he found he, he, he agreed with the governor that the limit, that the court had the power under the act to issue successive disaster proclamation, which would then reset the 30 day limitation. Okay. And, and how did that come to us on review as a reviewable issue? So it was, well, it, because it was part of, it is our position. And I think defendants agree with this, that it, because of the part of the, of the court order and the underlying basis for why the act, why our claims under the act fail, we believe it's, it's properly before this court. The, the, no, really? Does you guys agree? So the party, the parties did agree that this issue is probably before the court, properly before the court. You gave us jurisdiction on your agreement. Judge, we understand that, that, that we don't have the, we don't have the authority to agree on jurisdiction on that issue, but it is our plaintiff's position that the, because the trial court raised the issue and it was argued and briefed below, it is properly before this court, sorry, not briefed. It was argued below. It's probably before this court. Okay. Thank you. Sure. The, the one thing I think the, the, I understand that the second district recently came down your honors. I'm sure where the, with the Foxfire Tavern case where they ruled on this very issue. I don't think anything I can, basically the court and the second district adopted the governor's argument here, which is that there was nothing under the statute that prevents the court or the governor from doing what it does, which is these successive to their declaration. To your knowledge, do they have the benefit of the Michigan case that you cite in your library? They did not, to my knowledge, the, the hearing that Michigan case came down on The Michigan case came down the day we filed our brief judge. Oh, so you're right. They, they would have that. You're right. It would have been the Michigan case would have been already issued before the appellate court. The appellate court's decision of Foxfire, I think November 6th. Okay. Very good. We'll check those. Thank you. Sure. But I think, again, I think the court had it backwards in the second district. It said that the, there's nothing in the statute that prevents the governor from doing what he did, but it's plaintiff's position. There's nothing in the statute that allows him to do it. The, the, to, to, to suggest otherwise would effectively render meaningless that 30 day limitation. Again, I think, I think one needs to step back and say, what would the legislature trying to achieve and enacting the, the emergency management agency act. And it certainly wasn't to give the governor a free reign to rule the state by executive decree by declaring disasters every 30 days for the same disaster. And to that point, judge justice, justices, I direct you to the language of the statute that the, the, the, it uses the word disaster, not disasters, not ongoing disasters, not the same disaster, but disaster. There's one disaster here. And that's the COVID-19 pandemic and the, and, and the definition of disasters under the act. It's very clear. The legislator under the legislature understood that a disaster can last more than 30 days, but yet didn't say the governor can, could, could issue successive declarations for the same disaster. I think you're, you're quite a little while ago, Mr. No, I'm sorry. I apologize. Justice. He's just had a lengthy case. So that's true. If you have any, if you have any, any questions, I'd be happy to answer them. So any questions yet? No, it's hunger. Now you please the court deputy solicitor general, Sarah hunger on behalf of the governor. I would like to start, um, with reiterating that this appeal is from the denial of a preliminary injunction. Counsel said that the scope and nature of the pandemic is not properly before this court. That is not correct because one of the factors, one of the elements of preliminary injunctive relief is balancing of the equities and the circuit court below found that the equities tilt strongly in favor of the governor and the public in order for this court to reverse the decision, it would have to find that that finding was an abuse of discretion. So the scope and nature of the pandemic is very much before this court insofar as that is balanced against the harm alleged by the plaintiffs. It is also relevant with respect to justice rights question. When she asked which executive order is properly before this court plaintiffs sought preliminary injunctive relief, which is forward looking. And at this time, executive order 72 is in effect, executive order 30 is no longer in effect. And so this court should take into account not only the current status of the pandemic, but also the current executive order. That also, though, relates to the balance of the equities. The governor has long expressed an interest in balancing the interests of the landlords and also the interests of the public and the very, very significant public health and safety risk posed by this pandemic. Executive order 72, as well as the advent of the rental assistance program, demonstrates that commitment. In executive order 72, the landlords can now begin proceedings against non-covered persons. Covered persons are those who attest in a declaration that they have an income below a certain level, that they've suffered a COVID related hardship, that they've made best efforts on partial rent payments, and also that if they were to be shared living space or would be rendered homeless. Now, even plaintiffs in their opening brief on appeal said multiple times that they're not contesting a rule that would allow those who truly cannot pay their rent for an eviction related reason to be evicted. They simply did not want a blanket ban. Executive order 72 does take those interests into account. I would also like to note the updated status of the rental assistance program. I spoke with the Housing Development Authority yesterday, and as of yesterday, they had approved 38,629 grants for emergency rental assistance of $5,000 each, and that goes directly to the landlords. They're intending to disperse an additional $20 million, so that the amount would be $210 million, and there were 11,000 applicants who submitted applications, but they were not adequate. They missed a piece of information or filled the forms out wrong, and this housing authority sent notices allowing them to cure. So, there is relief on the way. The governor is taking into account the potential hardship suffered by landlords through the rental assistance program and through Executive Order 72. Now, on the other side of that ledger, as we all know, the pandemic is very deadly, and it has affected three-quarters of a million Illinois residents, and over 12,000 have died. There is also recent exponential growth in Illinois and across the country. If the evictions moratoria were lifted, of course, hundreds of thousands of individuals could become evicted in Illinois. That means that those individuals would be showing up to court, and they would have to be in contact with individuals outside of their household and not being able to socially distance or stay at home. It also would set into effect a chain of events that they would have to move out of their houses or their rental units, living with others, being rendered homeless, and also coming into contact with movers, et cetera. But beyond that, my opposing counsel today focused a lot of his time on the 30-day argument. That goes beyond the evictions moratoria. If this court were to strike down the governor's authority to issue any disaster proclamations at all, it goes beyond EO 72. Because in order for the governor to get federal relief, in order for him to send PPE and other medical supplies where it needs to go, he needs to have a state of emergency declared in Illinois. So if you look at the public harm and the harm to the governor on one side of the ledger, and then the potential pecuniary harm that is temporary and that the governor needs to relieve now and in the future, the circuit court did not abuse its discretion in concluding that the balance of equities tips in favor of the public and of the governor. I'd like to also, though, turn to the likelihood of success on the merits, because the governor believes that circuit court correctly decided the 30-day issue and the statutory counts as well. Starting with the 30-day question, I would note, as the second district did, that there's no limit on the number of proclamations in Section 7 of the statute. Instead, the only requirement is that a disaster exists. When a disaster exists, as the 30-day period is triggered, the statute is very clear about that. It's not upon the disaster, it's upon the proclamation. There's no limit on the number of proclamations that may issue. I would also note, as the second district did, that in the General Assembly's special session in the spring, three laws were enacted, each of which referred to the successive proclamations, which shows that the General Assembly was aware that the governor was issuing successive disaster proclamations and did not believe it needed to clarify the law to limit it to a single proclamation or otherwise intervene. Beyond the 30-day question, though, I would note that the governor also has authority under four separate subsections of Section 7, subsections 2, 8, 10, and 12. In response to a question about subsection 2, an exchange there, the utilization of state resources. If you continue on in that subsection, it also references the resources of each political subdivision of the state. Regardless of whether courts are a state government resource or another resource of the political subdivision, it would be covered by Section 2. I would also note that under Section 12, the rental of housing units or rental units is a commodity, and Section 12 does allow the governor to regulate economic transactions. So you're saying, Miss Unger, that the courts, in your interpretation, in your argument, is a subdivision of a what? Well, I suppose it could either be a resource of the state government or a resource of the local political subdivisions of the state. So wherever the resources come from, either the state or the local subdivision, if it's a circuit court, it would be covered by Section 7.2, so that the state resources is not the limitation that my opposing counsel believes that it is. So you're suggesting the circuit court is a creature of a local subdivision, not the state? Well, we would say that it is the state. That was our position, but to the extent my opposing counsel said it's limited to state resources, that is not what the text of the statute says. It's state resources or resources of each political subdivision of the state. So it is broader than just state resources. Each political subdivision, are there courts in each political subdivision of the state? I do not know the answer to that question, so I will not Okay, thank you. But there are also three other subdivisions under which the governor's actions are covered. We have Sections 8, 10, and 12. The governor is allowed to control and regulate the occupancy of the premises in Section 8, also create temporary emergency housing in subsection 10, and also, as we discussed under subsection 12, to regulate economic transactions, including commodities, which, of course, rental housing unit is a commodity. Turning to the separation of powers questions, the circuit court was correct that the governor's executive orders do not usurp the legislative authority because each action that the governor has taken is authorized by the Emergency Management Act. And the Emergency Management Act is a constitutional delegation because it provides sufficient standards for the governor to follow. For example, it lists exactly what constitutes an emergency, when the governor can declare such a disaster or emergency, and then it identifies in Section 7 all of the powers that the governor may exercise. It is quite clear. It also is not of infinite duration. There is the 30-day limit upon each proclamation. So each 30 days, the governor does have to reassess whether there is a disaster and then does have to determine which have seen that discretion exercised here. As we all know, the mitigation efforts and the executive orders have changed since March. Now we are back, unfortunately, in Tier 3, and more mitigations are imposed, but it does show that the governor is assessing the situation every 30 days and is not exercising unbounded or unlimited authority. The other separation of powers claim is that the governor has usurped judicial authority. That also, though, is not correct because the governor is not deciding or interfering with how cases are decided. Instead, he is simply issuing orders governing when claims may be heard. This is very similar to when a General Assembly, as it regularly does, institutes statutes of limitation. Statutes of limitation say precisely when a court may hear a claim. There are limits and there are timelines. Those have been upheld as valid as well. Here, too, there are more serious implications, as I have discussed, with respect to the evictions orders as opposed to other court proceedings. In addition to the hundreds of thousands of individuals potentially showing up to court and having additional conduct there, it also sets a causal chain into effect that does require an individual to have numerous additional contacts outside of their homes. In that way, it is different than other types of court proceedings. Finally, I would like to touch on a third requirement of preliminary injunctive relief, and it is that plaintiffs show that they suffer irreparable injury or harm. Plaintiffs have also not shown that requirement here because all of their harm can be measured under a pecuniary standard, monetary damages. We would submit that the plaintiffs have also not shown that factor for preliminary injunctive relief. I do see that my time is about to expire, and so if there are any additional questions that I can answer, I'd be happy to touch on any other topics in my remaining time. I do have an additional question, counsel, to follow up with my question to Mr. Noonan, and that is, with respect to the irreparable harm, was there any allegations in the complaint for injunctive relief that these three landlords would have been able to move forward with an eviction in spite of Supreme Court's moratorium on evictions, our Illinois Supreme Court's moratorium on certain evictions, and the CDC's moratorium on evictions? Do we know whether these three landlords would have been able to move forward? I am not aware of any such allegations, and I'm also not aware of the current status of the landlord's properties if, for example, the tenants are covered persons or non-covered persons under Executive Order 72, whether they've had those conversations with their tenants or whether their tenants have applied for the rental assistance program relief. There's a lot, unfortunately, that we don't know. But isn't it required in order to show irreparable harm in terms of the allegations of the complaint? Because the CDC restrictions existed at the time Judge Anderson was deciding whether irreparable harm was present. In addition, if I understand the allegations of the complaint for injunctive relief, they're not alleging that they're in danger of losing their property to foreclosure. And I presume that's because there's also a moratorium on foreclosures. So they have not alleged that they would be subject to foreclosure, which certainly could be a different situation because property is unique. Right now, they're just alleging that their renters are still in the possession of the property, all of which can be recovered by monetary damages in the future and can be measured under a pecuniary standard. And that is the standard here. Would they have the opportunity to present lost opportunity costs? They would likely have the opportunity to present that to the extent I can't think of what that would be that could not be remedied by monetary damages. But should they be able to show something of that nature, it could go to irreparable harm. And finally, I don't mean to belabor the point, but we're not allowed to give advisory opinions. This is an interesting issue. But is it moot? Is it moot? I don't think that your honors have enough information in the record to determine whether it is moot or not. And we on the governor's side also do not have that information because I think it depends upon the particular situation of each landlord. So for example, are they able to seek relief now under Executive Order 72 or because their tenants are posing a health and safety hazard? We simply don't have that information. Or whether they were able to move forward with the evictions. Right. Under the CDC and Supreme Court guidelines. And that would mean that the court would not be able to see moratorium. So you don't think we're barred by mootness? Do you think we can move forward? Yes. Given the information at least that is in the hands of the governor, we have not asserted mootness. But to the extent opposing counsel does have additional information and that can be considered by the court, then the case might be rendered moot. Thank you. The governor asks that this court affirm the decision of the circuit court. Thank you, Ms. Unger. Mr. Noonan, any rebuttal? Yes, Justice. To Justice Wright's comments about the CDC order. The CDC order did not come out until the ruling came out about a week after the ruling in this case that was issued on August 8th and Judge Anderson's ruling came down on the 31st. So no party to the case had the benefit, call it that, of the CDC order. And there's certainly nothing in the complaint which would anticipate that the CDC's order with respect to whether these tenants are covered persons under that order. Yeah, which is the reason for my original question long ago. And that is which order are we looking at 72 or 30? Because 72 has different provisions in it. That's correct, Judge. And again, to answer to be direct and answer your question, it is our plaintiff's position that the order that we're challenging is 30. And that's the one that goes 30 preliminary injunction, correct? Yes, that's the preliminary injunction. And that's the blanket moratorium on decision now. That's correct. I just want to make sure because earlier and I may have misheard you, I thought you said earlier in your opening remarks that you were challenging 72. You are not challenging 72. You are challenging 30. That's correct. All right. Thank you for clarifying that. Again, so a couple things to Justice Holder's comment earlier in the judge's ruling on the 30-day limitations found in the record at 463 to 467. Thank you. A couple of points in her remarks ended on September 4th. And as of today, although the governor is apparently thinking about extending it or renewing it, there's certainly nothing available to compensate the plaintiffs going forward on this case with respect to any current programs. In addressing the council's comments on the Foxfire case, I recognize that it's an argument they made in this case as well. And the appellate court in the second district seemed to accept the fact that some new successive declarations. But it is our position that what the legislature was doing in that case was basically recognizing the facts on the ground. By the time that those legislations and amendments to those statutes have been effected, the governor had already issued several disaster proclamations. So it's our position that that should not be read as an endorsement from the general assembly of the governor's decision here. Quite the contrary. Constructive enactment under their legislative powers. Of course. Yes, exactly. That's true. Yes, you're right. On the separation of powers issue, I think council and the governor has it wrong. It is our position that the moratorium invades the legislature's power here with respect to the legislation, i.e. the eviction act. And probably more serious is the invasion of the court's powers to control the cases that come before it. With respect to the invasion of the legislative powers, the eviction action is a summary proceeding. And the mere fact that there's a postponement of that is a rewriting or abolition or negation of the summary aspects of that piece of legislation. So to the extent that the moratorium prevents someone from getting summary relief under the eviction act, it is an invasion of the legislative province and interferes with that statute. As far as the separation of powers argument with respect to the invasion of the province of the judiciary, I don't think I need to tell your justices, it is the court's power to stay cases. It's been well-recognized that that is a judicial function to stay cases. And in fact, the Supreme Court in response to the pandemic authorized all of the circuit courts to do just that. And many of them did that. Many of them said, we are going to suspend evictions or moratoriums or just general litigation files until things clear up. And critically here is that Will County didn't. Will County said, we can take these cases and we'll accept these filings. But the governor's moratorium prevented the plaintiffs from doing that. I want to say a moment here, my last closing statement I'd like to make is that the- How long is it Mr. Newman, you're tying us up. I'm sorry. We let this hunger go on though. So I appreciate having that. So I appreciate it. Thank you. And I will be very brief, I promise. The desire to protect distressed tenants is obviously a laudable goal. And a lot of people are suffering in this pandemic, but it is plaintiff's position that the moratorium basically shifts the cost of taking care of that class of people onto landlords. The moratorium is essentially a welfare program privately funded by landlords who happen to have hardship tenants. This is something the state should support through a reallocation of state resources, grants or taxes or whatever. But it is unfair to make one class of citizens pay in some fashion other than taxes to remedy this problem. This is a state problem that the legislature should tackle. And that was the purpose behind the Emergency Management Act was to allow the legislature to address these problems after the 30-day period. With that, Judge, I would ask that the decisions of Judge Anderson and the circuit court be reversed and this case remanded for this proceeding. Sorry, Justice McDade, I have one additional short question as a follow up to your closing remarks, Mr. Noonan. In terms of irreparable harm, I understand your argument that we are subsidizing low-income people by allowing them to stay in apartments or homes without paying rent. However, in terms of irreparable harm to your clients, what's the likelihood that once the eviction goes forward and the apartment or home is vacated, that they're going to generate additional revenue with a new tenant? And is that relevant? Great questions. And I don't know if it's relevant, but I will say is that, again, this is not part of the record, of course, but given the fact that there are tenants who have not paid rent, particularly in Mr. Donabas' case for over a year now, the likelihood that we're any money from that tenant is probably very remote. What the plaintiffs would like to do is to get that tenant out and put a paying tenant in. Lost opportunity. Yes. Thank you. Are there any other questions? No. Okay. We thank both of you for your arguments this morning. We'll take the matter under advisement and we'll issue a written decision. The court will stand in brief recess until noon, I think. No, 1030.